AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| 2347 Sutphin Street, Middletown, Ohio | ) ) ) |

Case No. 3:18 mj 727

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment B

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment H

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute/distribution controlled substances |
| 21 USC s. 843(b) | use of a telephone communication facility |
| 21 USC s. 846 | conspiracy to possess with intent to distribute/distribute controlled substances |

The application is based on these facts:

See Attached Affidavit of Lauren Wagner

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Lauren Wagner, SA of the DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11-6-18

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Lauren Wagner, hereby duly sworn, declare and state:

I.

### INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA").  I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878.  Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2.   I have served as a DEA SA since approximately September 2017 and am currently assigned to the DEA Detroit Division Dayton Resident Office, Group D-46.  Prior to my employment with the DEA, I served as a Criminal Investigator for the New York State Department of Taxation and Finance Criminal Investigations Division Cigarette Strike Force from September 2013 to August 2017.  Through that position, I investigated financial crimes including: money laundering, structuring, and cash smuggling.  I have interviewed numerous subjects/defendants involved in and/or arrested for tax and drug violations and have participated in several joint interagency federal and state investigations.  In September 2017, I reported to DEA Basic

1

Agent Training in Quantico, Virginia. In January 2018, I
completed the 19 week Basic Agent Training Academy at the DEA
Justice Training Center in Quantico, Virginia. While attending
Basic Agent Training, I received instruction on topics including
narcotics identification, surveillance techniques, methods of
operation of narcotics traffickers, law, evidence handling,
undercover operations, current trends/patterns involving the
distribution of narcotics, as well as other areas of drug
enforcement. During my career with the DEA, I have participated
in multiple controlled substances investigations, including
investigations involving marijuana, cocaine, heroin,
methamphetamine, and fentanyl. Additionally, I have conducted
physical surveillance and have monitored buy/walk operations.
Through my training and experience, including on-the-job
discussions with other law enforcement agents and respective
cooperating agencies, I am familiar with the activities of drug
smugglers and drug trafficking distribution networks. During
the conduct of my official duties, I have authored various
affidavits to include, but not limited to: search warrants and
criminal complaints.

3. Based on my training and experience – including my
participation in the investigations referenced above – as well

2

discussions and interactions with other experienced DEA SA's,
Task Force Officers ("TFO"), and narcotics investigators, I am
familiar with the manner in which drug trafficking organizations
in Mexico and their customers in the United States smuggle,
safeguard and distribute narcotics and then collect as well as
launder the proceeds therefrom.  For instance:

            a.    Mexican drug trafficking organizations send
individuals to the United States, carrying with them bulk
amounts of controlled substances (hereinafter "couriers").
These individuals sometimes cross the United States – Mexico
border via a car or other vehicle that contain hidden
compartments commonly known as "traps."  With the controlled
substances concealed in these traps, the courier then transports
the controlled substances to recipients in the United States who
either distribute or sell these narcotics here.  Mexican drug
trafficking organizations also use trap vehicles to transport
from the United States to Mexico money that the enterprise has
collected here from its drug trafficking activity.  On other
occasions, Mexican drug trafficking organizations send couriers
to the United States who have concealed the controlled
substances within their bodies (hereinafter "internal body
couriers").  Internal body couriers often obtain one-way airline

3

tickets and fly from the United States-Mexico border region to their intended destination further inside of the United States; once there, internal body couriers expel or remove the narcotics from their body and deliver these illegal drugs to a recipient in this country.  On occasion, the internal body couriers will receive drug proceeds while in the United States and conceal this cash on their person or in their luggage during their return travels to Mexico.

   b. Upon receipt of the controlled substances in the United States, the domestic customers of the Mexican drug trafficking organizations then sell these illegal narcotics through their own local distribution networks.  The domestic customers often store these controlled substances at various locations commonly referred to as stash houses.  After selling these controlled substances to their own clients, the domestic customers collect the money from their sales and arrange for a portion of the money to be transferred to their source of supply in Mexico.

   c. To collect these funds, Mexican drug trafficking organizations often will send individuals to the United States, or rely on individuals already in this country. Upon collecting this money in the United States, individuals

will return these funds to Mexico in the ways described above as well as through wire transfers or depositing funds in domestic bank accounts for withdrawal in border regions.

d. Mexican drug trafficking organizations and their domestic customers often use a variety of tools and techniques to facilitate the above-described activities and to prevent law enforcement from detecting their operations. These entities often use cellular telephones to speak with, or send text messages to, the members of the organization, including its couriers and customers in the United States. They also use other telecommunication services such as landlines and paging devices for similar purposes. When using any of these devices, members of Mexican drug trafficking organizations and their domestic customers occasionally communicate in coded language in an effort to disguise the true nature of their conversations. For instance, they may refer to drugs using innocuous terms, such as articles of clothing, fruits and vegetables, or types of meat. To prevent law enforcement from identifying the telephone numbers that it uses, members and associates of Mexican drug trafficking organizations and their domestic customers often frequently change numbers (e.g., commonly called "dropping phones") or place subscriber information in the names of

fictitious or nominee individuals. These enterprises engage in counter-surveillance techniques, including, but not limited to, abruptly altering driving patterns or travel plans in an effort to determine if law enforcement has tracked or otherwise identified its members. Mexican drug trafficking organizations and their domestic customers occasionally use legitimate businesses or legitimate activities as a front for the distribution of illegal drugs or the collection of proceeds therefrom. Drug traffickers, including members of these organizations, frequently carry firearms and other dangerous weapons with them to protect their illegal narcotics and drug proceeds from robbers and rival drug dealers.

## II.

### PURPOSE OF AFFIDAVIT

4. I make this affidavit in support of an application for search warrants for the following locations as there is probable cause to believe that evidence, instrumentalities, and the fruits associated with the following offenses - namely, Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance and distribution of a controlled substance); Title 21, United States Code, Section 843(b) (unlawful use of a communications facility); Title 21,

United States Code, Section 846 (conspiracy to possess with
intent to distribute and to distribute controlled substances) –
exists and can be found there:

      a.    412 Weaver Street, Middletown, Ohio, including
any outbuildings, storage units, garages or curtilage associated
with this property (hereinafter "**Target Residence 1"**).  This
property is more fully described in Attachment A, which is
attached hereto and incorporated herein by reference.

      b.    2347 Sutphin Street, Middletown, Ohio, including
any outbuildings, storage units, garages or curtilage associated
with this property (hereinafter "**Target Residence 2"**).  This
property is more fully described in Attachment B, which is
attached hereto and incorporated herein by reference.

      c.    1203 Baltimore Street, Middletown, Ohio,
including any outbuildings, storage units, garages or curtilage
associated with this property (hereinafter "**Target Residence
3"**).  This property is more fully described in Attachment C,
which is attached hereto and incorporated herein by reference;

      d.    4623 Freedom Ct, Middletown, Ohio, including any
outbuildings, storage units, garages or curtilage associated
with this property (hereinafter "**Target Residence 4"**).  This
property is more fully described in Attachment D, which is

7

attached hereto and incorporated herein by reference;

e. R & J Storage, Unit #46, 3124 Verity Parkway, Middletown, Ohio (hereinafter **"Target Location 5"**). This property is more fully described in Attachment E, which is attached hereto and incorporated herein by reference;

f. 5821 Stonebridge, Columbus, Ohio, including any outbuildings, storage units, garages or curtilage associated with this property (hereinafter **"Target Residence 6"**). This property is more fully described in Attachment F, which is attached hereto and incorporated herein by reference;

g. 7791 Heathermoor, Columbus, Ohio, including any outbuildings, storage units, garages or curtilage associated with this property (hereinafter **"Target Residence 7"**). This property is more fully described in Attachment G, which is attached hereto and incorporated herein by reference;

5. Based on my training and experience, my discussions with other agents as well as the matters described below, I believe that there is probable cause to believe that the items listed in Attachment H will be found at the premises described above.

6. I also submit this affidavit in support of criminal complaints against, and arrest warrants for, the following

8

individuals for a violation of Title 21, United States Code, Section 846 and 841(b)(1)(B) (conspiracy to possess with intent to distribute and to distribute 40 grams or more of fentanyl, a Schedule II controlled substance, and 100 grams or more of heroin, a Schedule I controlled substance):

a. Gustavo Karin Tarabay-Viera ("Tarabay") of 2437 Sutphin Avenue, Middletown, Ohio (i.e., **Target Residence 2**). Tarabay traffics opioids and serves either as Pablo Portalatin's source of drug supply or his stash house operator.

b. Pablo Portalatin Jr. ("Portalatin") of 412 Weaver Street, Middletown, Ohio (i.e., **Target Residence 1**). Portalatin coordinates the sale of bulk quantities of fentanyl in southern Ohio.

c. Joannie Santiago-Agosto of 1203 Baltimore Street, Middletown, Ohio (i.e., **Target Residence 3**). Santiago-Agosto serves as a drug courier for Portalatin and Tarabay.

d. Maribel Cruz of 1203 Baltimore Street, Middletown, Ohio (i.e., **Target Residence 3**). Cruz serves as a drug courier for Portalatin and Tarabay.

e. Jaberri J. Bratton who is a customer of Tarabay and was discovered with over 4 ounces of suspected heroin.

9

### III.

### SOURCES OF INFORMATION

7.    I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following sources: oral and written reports about this investigation and other investigations that I have received from federal agents as well as state and local law enforcement agencies; physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly; telephone records, including toll records and subscriber information; information developed from cooperating sources; information developed from the use of pen registers and/or trap and trace; public records; electronic global position satellite ("GPS") information for various cell phones obtained through federal search warrants; consensually recorded conversations and/or calls; and court-authorized interceptions of wire communications pursuant to Title III.

8.    Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement

officer who provided the information to me, either verbally or in a written report.  The officer providing me with the information may have received the information by way of personal knowledge or from another source.  Except where otherwise noted, the information set forth in this affidavit has been provided directly or indirectly by agents of the DEA or other law enforcement agencies.  Whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Moreover, the use of quotations to describe conversations herein either identify the actual words of the speaker or the interpretation of those words.

9.    This affidavit does not include every fact known to me through the investigation, but rather those facts required to establish probable cause for the warrants and complaints requested above.

## IV.

## PROBABLE CAUSE

### A.    Background

10.   Since at least 2013, DEA agents from Dayton, Ohio, and

11

Cincinnati, Ohio, have participated in a series of
investigations involving the distribution of various drugs –
including fentanyl, heroin, and methamphetamine – from
Michoacán, Mexico to southern Ohio. As detailed more fully
below, I believe that an individual – namely, Pablo Portatalin -
- a historical associate of this Michoacán drug enterprise – has
established an illegal fentanyl operation centered in
Middletown, Ohio. Portalatin employs drug couriers, including
Santiago-Agosto and Cruz, to deliver his illegal product to his
customers. Tarabay serves either as a source of supply or drug
trafficking partner of Portalatin.

11. Through prior investigations, DEA has linked
Portalatin to Michoacán-based drug operations. In particular:

a. During late 2013 and early 2014, DEA
participated in a drug investigation in Dayton, Ohio concerning
Jesus Gonzalez-Rojas and his brother, Armando Gonzalez-Rojas.
Through this investigation, DEA learned that the brothers
distributed kilograms of heroin throughout the Dayton, Ohio
area during 2013 and 2014. They imported these drugs from
Michoacán, Mexico. For instance, on or about December 19,
2013, law enforcement recovered approximately one kilogram of
heroin from 5112 Lauderdale Drive, Dayton, Ohio. Armando

Gonzalez-Rosas was at the residence when agents seized these narcotics. Additionally, law enforcement previously had discovered his fingerprint on drug packaging at another residence. During 2014, federal authorities arrested Jesus Gonzalez-Rojas, and he ultimately pleaded guilty in federal court to being an illegal alien in possession of a firearm. Shortly after this arrest, Armando Gonzalez-Rosas fled from the Dayton area.

b. In or around 2017, DEA located Armando Gonzalez-Rosas in Cincinnati, Ohio and began to investigate him for drug trafficking activity. During that matter, agents physically observed Armando Gonzalez-Rosas and Portalatin with one another. During 2018, a federal grand jury charged Armando Gonzalez-Rosas and several other people with violations of federal drug laws, including conspiracy to distribute in excess of one kilogram of heroin between August 2017 and January 2018. Armando Gonzalez-Rosas is currently awaiting trial in that matter.

c. During March 2018, a cooperating defendant (hereinafter "CD") participated in a meeting with DEA in Cincinnati, Ohio. CD agreed to speak with law enforcement in an effort to mitigate not only federal drug charges pending against him but also any potential sentence imposed on him in that case. Law enforcement believed that CD was truthful and

credible during this meeting as many of CD's statements could be corroborated through independent facts. During this conversation, CD indicated that CD knew Portalatin worked with Armando Gonzalez-Rosas to distribute controlled substances in southern Ohio. According to CD, Portalatin stored kilograms of heroin at his home in Middletown, Ohio, on behalf of Armando Gonzalez-Rosas as well as individuals located in Mexico. CD also indicated that a woman identified as Santiago-Agosto delivered drugs for Portalatin. CD also described the manner in which Armando Gonzalez-Rosas and Portalatin obtained illegal drugs from Mexico. According to CD, Mexican sources of supply often sent to southern Ohio drug couriers who ingested illegal drugs while in Mexico and then expelled this contraband from their bodies upon reaching Ohio. CD advised that, alternatively, the Mexican source of supply concealed the drugs in truck drive shafts, which were then sent to southern Ohio.

**B. Local Police Develop an Informant Who Had Purchased Fentanyl From Portalatin**

12. During summer 2018, the Middletown Police Department ("MPD") stopped and ultimately arrested a person (hereinafter identified as "CS-1") in or around Middletown, Ohio with several grams of fentanyl. On or about August 1, 2018 – a short time after this incident – CS-1 agreed to cooperate with MPD in an effort to reduce pending state charges as well as to

mitigate any possible sentence in that state matter. Prior to his arrest in summer 2018, CS-1 had sustained the following convictions and/or arrests: public intoxication (2008); wanton endangerment (2012); possession of drugs (2016); trafficking in heroin (2016) and theft (2018). Based on interactions with CS-1 and the ability to corroborate information received from CS-1, law enforcement considers CS-1 credible and reliable.

13. On or about August 1, 2018, MPD interviewed CS-1 concerning CS-1's involvement in drug trafficking activity. According to CS-1, during summer 2018, CS-1 purchased quantities of fentanyl from a person in Middletown that CS-1 identified as "Pablo." CS-1 indicated that CS-1 contacted "Pablo" via cellular telephone to arrange these deals. CS-1 advised that "Pablo" used 513-849-9227 (hereinafter "Target Telephone 1") to conduct these drug transactions. CS-1 further explained that, after arranging the purchase over Target Telephone 1, "Pablo" often sent a woman to deliver the illegal drugs. Finally, CS-1 agreed to make controlled purchases of drugs from "Pablo" at the direction of law enforcement. As detailed more fully below, law enforcement has confirmed that "Pablo" is, in fact, Portalatin.

C. **During early August 2018, the MPD Uses CS-1 to Conduct a Series of Controlled Purchases from Portalatin.**

14. During early August 2018, acting under the direction

of the MPD, CS-1 made a series of controlled purchases from

Portalatin and his associates in the Middletown, Ohio area.

Occurring on or about August 2, 2018, August 6, 2018, and

August 9, 2018, each controlled purchase followed a similar

general pattern. During these transactions, CS-1 placed a

consensually recorded call to Portalatin at Target Telephone 1

and arranged the purchase of fentanyl, including the meet

location for the transaction. After conclusion of the calls,

while under MPD surveillance, CS-1 met in the parking lot of a

local Middletown restaurant with a courier – either Santiago-

Agosto or Cruz – who delivered the drugs on behalf of

Portalatin. During each transaction, Portalatin's couriers

brought approximately one ounce of fentanyl to CS-1. For

instance, the controlled purchase that occurred on August 9,

2018 exemplifies these prior referenced transactions:

a. On August 9, 2018, CS-1 placed a consensually

recorded call to Portalatin. An individual that CS-1 recognized

as Portalatin answered and engaged in the following exchange:

| | |
|---|---|
| Portalatin: | Hello |
| CS-1: | What's up |
| CS-1: | I was thinking about getting a whole one. |
| Portalatin: | The whole one. |
| CS-1: | Yea |

16

Portalatin:     Okay, what time can you be there?

CS-1:     I can leave [a city in southern Ohio] right now so like 30 or 40 minutes

Portalatin:     30 or 40 minutes

CS-1:     How much?

Portalatin:     The same like 21 . . . without like 50 bucks

CS-1:     Alright about like 30 or 40 minutes

Portalatin:     All right be like an hour so I can send to Dayton 25 minutes there and 25 back in like an hour

CS-1:     Where you wanna meet?

Portalatin:     Same place if you want.

Portalatin:     Like 3:20 I will call them now and she is right there and the place is kind of heavy

CS-1:     All right bye.

Based on my training and experience, the events described below, as well law enforcement conversations with CS-1, I believe that, in the above call, CS-1 advised that CS-1 wanted to purchase one, *i.e.*, a full ounce of fentanyl, from Portalatin. Portalatin then quoted CS-1 a price of "21" or $2,100 for the ounce. Portalatin further advised that he had to acquire the drugs from Dayton and would arrange for the delivery of the drugs to CS-1 at the previous meet location – namely, Steak N' Shake in Middletown, Ohio.

17

b.    Around the time of this call, law enforcement began to watch **Target Residence 3.** During this surveillance, they saw Portalatin arrive at this location.  Shortly thereafter, Santiago-Agosto and a woman identified as Cruz arrived at **Target Residence 3** in a Toyota Corolla.  Staying only briefly at this location, Santiago-Agosto and Cruz then drove the Toyota Corolla to the Steak N' Shake in Middletown, Ohio.  Once there, Cruz approached and then entered CS-1's vehicle. According to CS-1, Cruz gave CS-1 an ounce of fentanyl in exchange for $2,100 in cash.  After this transaction, law enforcement followed Santiago-Agosto and Cruz as they returned to, and ultimately entered, **Target Residence 3.**  Based on my training and experience, I believe that Santiago-Agosto and Cruz likely took with them into **Target Residence 3** the cash obtained from CS-1.

c.    After this deal, law enforcement met with CS-1.  CS-1 gave to law enforcement a clear baggie containing approximately 28 grams of a controlled substance that field tested for the presence of heroin/fentanyl.  According to CS-1, Cruz delivered these drugs to CS-1.

15.  Upon reviewing toll records for Target Telephone 1 around the time of these aforementioned drug transactions, law enforcement noticed a pattern emerging.  In particular, upon receiving a call from CS-1 arranging a drug deal, Target

18

Telephone 1 often promptly contacted 937-250-2475. Such contacts between Target Telephone 1 and 937-250-2475 occurred around the transaction on or about August 2, August 6, and August 9, 2018.

16. On or about August 13, 2018, suspecting that Portalatin had an accomplice using 937-250-2475, DEA obtained a federal warrant authorizing the collection of certain location information for that number for thirty days. Upon execution of this warrant, agents began to track 937-250-2475. On or about August 20, 2018, location information from that warrant placed 937-250-2475 in Zanesville, Ohio. Agents responded to the location of 937-250-2475 and observed Gustavo Tarabay in the area. Likewise, on or about August 25, 2018, agents noticed 937-250-2475 move from **Target Residence 2** to the Cincinnati Premium Outlets in Monroe, Ohio. Agents responded to the outlet mall, and upon locating the general vicinity of the telephone, they once more observed Tarabay. Additionally, during late August and early September 2018, 937-250-2475 frequently had been located in or around the vicinity of **Target Residence 2**, where surveillance has placed Tarabay.

**D.    On or about August 22, 2018, Using the Target Telephone 1, Portalatin Contacts Other Co-Conspirators, including Tarabay, in Arranging the Sale of Drugs to CS-1 and CS-2**

17. On or about August 22, 2018, acting at the direction of law enforcement, CS-1 and a second informant (hereinafter

19

CS-2)[1] purchased approximately 5 ounces of suspected heroin/fentanyl mixture from Portalatin and Tarabay in exchange for several thousand dollars in cash. To negotiate this transaction, CS-1 participated in consensually recorded calls with Portalatin who was using the Target Telephone 1. Additionally, based on toll records, surveillance, as well as my training and experience, I believe that Portalatin used Target Telephone 1 to contact Tarabay at 937-250-2475 to arrange this acquisition of the fentanyl sold to CS-1 and CS-2. In particular:

a. During the late morning of that day, DEA began to watch several locations, including **Target Residence 2** and **Target Residence 3**, both located in Middletown, Ohio. Around this time, CS-1 placed a consensually recorded call to Portalatin at Target Telephone 1 and engaged in the following exchange with him:

Portalatin:     Hello.

CS-1:          Hey what's up.

---

[1] At the time of these events, DEA believed CS-2 to be reliable in that he had provided information in the past that law enforcement has been able to corroborate. CS-2 has a criminal history, including prior convictions for drug trafficking. CS-2 had agreed to assist DEA in the hopes of receiving monetary rewards. It should be noted that, on September 21, 2018, Homeland Security Investigations arrested CS-2 on a federal warrant, charging him with attempting to purchase kilogram quantities of cocaine and methamphetamine. CS-2 has been deactivated as DEA source.

| | |
|---|---|
| CS-1: | Shit ready for you. |
| Portalatin: | You ready. |
| CS-1: | I need one and my dude needs 2 of them, so I need 3 of them. |
| Portalatin: | Okay, let me call (inaudible) and let me call you back |
| CS-1: | He say how long. |
| Portalatin: | Like 10 minute and let me call him now and I will call you back. |

Based on my training and experience, the events described below, as well law enforcement conversations with CS-1, I believe that, in the above call, CS-1 advised that CS-1 wanted to purchase an ounce of fentanyl and his "dude", *i.e.*, CS-2, sought 2 ounces of fentanyl for a total of 3 ounces. Portalatin responded that that he would call "him," i.e., his source for drugs, and then re-contact CS-1. It should be noted that toll records confirm this call between CS-1 and Target Telephone 1.

    b.    I have reviewed toll records from Target Telephone 1 and learned that, immediately after the above-described call, Target Telephone 1 contacted 513-849-9933, a number associated with Cruz. As noted above, both Cruz and Santiago-Agosto previously delivered suspected fentanyl to CS-1 during early August 2018.

    c.    Following the contact with 513-849-9933,

Portalatin used Target Telephone 1 to call CS-1 and engage in the following conversation:

> CS-1: Hello
>
> Portalatin: The woman on the way to get it, so around 1:20 or 1:30
>
> CS-1: Okay, I will be there, same place or what?
>
> Portalatin: Same place but go to the Wendy's next to the restaurant.
>
> CS-1: Alright

Based on my training and experience, the events described below, as well law enforcement conversations with CS-1, I believe that, in the above call, Portalatin advised that his couriers, i.e., Cruz and/or Santiago, planned to pick up the drugs from his source of supply and would meet CS-1 at a Wendy's in Middletown, Ohio near the prior meet locations. CS-1 agreed to that arrangement. It should be noted that toll records confirm this call between CS-1 and Target Telephone 1.

      d.   Shortly after ending this call with CS-1, Target Telephone 1 contacted 937-250-2475, which, based on location information from the federal search warrant, was in the vicinity of **Target Residence 2**. Based on my training and experience, as well as the observations described below, I believe that, through this event, Portalatin used Target Telephone 1 to contact his source of supply, Tarabay, at 937-

250-2475 to procure drugs intended for resale to CS-1.

        e.    Around 1:00 p.m., law enforcement saw Santiago-Agosto, Cruz, and some minors leave **Target Residence 3** and enter the Toyota Corolla. The group then travelled to **Target Residence 2**, where Tarabay exited the apartment building and approached the Toyota. Tarabay leaned into the car and then returned to **Target Residence 2**. The Toyota then left **Target Residence 2** and traveled to the agreed upon meet location – namely, a Wendy's in Middletown, Ohio. Based on my training and experience, as well as the events described below, I believe that Tarabay provided several ounces of fentanyl to Cruz and Santiago-Agosto for delivery to CS-1.

        f.    As the Toyota made its way to the Wendy's, at the direction of DEA, CS-1 placed another call to Portalatin at Target Telephone 1 and ordered additional amounts of fentanyl. During this exchange:

| | |
|---|---|
| Portalatin: | Hello? |
| CS-1: | I was calling my other dude and he said he need 2 too, so I don't know if you want to bring it now. |
| Portalatin: | Excuse me |
| CS-1: | I need another 2, my other cousin said he needed 2 too |
| Portalatin: | Okay for today |
| CS-1: | So whenever you ready I am ready |

23

| | |
|---|---|
| Portalatin: | You already got those 3 |
| CS-1: | Yea I got that |
| Portalatin: | Okay I will tell the girls to go back, how long's it gonna be |
| CS-1: | I can get the money now, can you do 10 for 5 of them or what. It will be like 42 now so if you can do like 10. Hello? Hello? |

With the call apparently disconnecting, CS-1 contacted Portalatin again at Target Telephone 1 and continued the previous conversation.

| | |
|---|---|
| Portalatin: | Hello |
| CS-1: | You hear me I was say 10 of them I mean 5 for 10 |
| Portalatin: | 5 for 10 |
| CS-1: | Yea so I can make a little but if not that's cool |
| Portalatin: | That will work 5 for 10 |
| CS-1: | K that cool I am about to pick the money up, how long they gonna be |
| Portalatin: | What you mean how long, I'll send her, She going there to pick up peoples money, and I will tell her to bring 2 more. |
| CS-1: | OK I will be there, I will be there in like 15 minutes |
| Portalatin: | 5:15 |
| CS-1: | 15 minutes |
| Portalatin: | Oh My gosh they have to drive to Dayton, Do you want to do it Dayton |

|  | Mall, Close to Dayton Mall, not to far, its not gonna be 15 minutes its gonna be a little more. |
| CS-1: | Do you want me to get the 3 now or just wait until she brings the whole 5 |
| Portalatin: | Okay give it to me know and when she goes to pay those people I will tell her to get 2 more. |
| CS-1: | Okay, okay. |
| Portalatin: | You wanna pay for those, and you go there with the money, and tell them about the more, and she will have time to go back again. |
| CS-1: | Okay that's cool |
| Portalatin: | Okay. |

Based on my training and experience, the events described below, as well law enforcement conversations with CS-1, I believe that, in the above call, CS-1 advised that CS-1 wanted to purchase two more ounces of drugs in addition to his initial order of 3 ounces. CS-1 then inquired if the price would be 5 for 10, *i.e.*, 5 ounces for $10,000. Portalatin then confirmed that price, but advised that his couriers would have to drive to Dayton, Ohio to acquire the extra drugs. Portalatin and CS-1 ultimately agreed that the couriers would deliver the first 3 ounces and then retrieve the additional drugs that CS-1 ordered from Portalatin. It should be noted that toll records confirm these calls between CS-1 and Target Telephone 1.

g. Nearly contemporaneous with the call referenced

in Paragraph 19(f) above, the Toyota carrying Cruz and Santiago-Agosto arrived at the Wendy's. Law enforcement saw Cruz exit the Toyota and approach the CS-1's car. Cruz then delivered 3 ounces of fentanyl to CS-1 in exchange for $6,000.[2] Cruz returned to the Toyota, and law enforcement followed that car to a residence in Middletown, where it stopped briefly before returning to **Target Residence 3**. Once there, Cruz left the Toyota and entered **Target Residence 3**.

      h.    Around the time that Cruz returned to that location, Portalatin used Target Telephone 1 to contact CS-1 and to question CS-1 concerning the amount of money provided to Cruz as well as the delivery of the additional quantity of drugs. In particular:

| | |
|---|---|
| Portalatin: | Hey |
| CS-1: | What's up |
| Portalatin: | They are already there and it's missing $300 bucks, you only gave me 6 |
| CS-1: | Right, So 4 more, I gave you 6 for the 3 so only 4 more for the other 2 right |
| Portalatin: | It's 21 a piece |
| CS-1: | Oh, you said 21 a piece |
| Portalatin: | (inaudible) I got to pay |

---

[2] After this deal, law enforcement met with CS-1. CS-1 gave to law enforcement several ounces of a controlled substance that field tested for the presence of heroin/fentanyl. According to CS-1, Cruz delivered these drugs to CS-1.

```
CS-1:          I only got 4 on me.  So I guess I will
               just take 1 then
Portalatin:    It's okay you can just owe me the rest
               it is not a big problem, but I got to
               pay (inaudible), when you ready you
               just pay me.

CS-1:          I am about to figure it out, they
               already there

Portalatin:    They started driving now

CS-1:          Alright so how long till they get
               there

Portalatin:    But she called me and (inaudible) it
               was only 6

CS-1:          Yeah, so 4 okay

Portalatin:    I told her I would take the heroin
               when she came in, not a big deal no

CS-1:          Alright I'll be there, how long 'til
               they be there

Portalatin:    Be there in like 20 minutes, time to
               drive

CS-1:          Alright I'll be there

Portalatin:    Okay you be there, she was gonna drive
               home but I will tell her to go back to
               the same place.
```

Based on my training and experience, the events described

below, as well law enforcement conversations with CS-1, I

believe that, in the above call, Portalatin advised CS-1 that

CS-1 had provided insufficient money for 3 ounce purchase. CS-

1 asked if Portalatin wanted to delay the delivery of the

additional 2 ounces based on this shortfall of money.

Portalatin indicated that the insufficient funds did not represent a significant problem and that the courier would meet with CS-1 at the same meet location again shortly.

        i.   I have reviewed toll records for Target Telephone 1 and noted that, promptly after the call described in Paragraph 19(h), Target Telephone 1 contacted 937-250-2475. Notably, around the time of this toll, law enforcement conducting surveillance at **Target Residence 2** saw Tarabay exit that location; Tarabay appeared to be using his cellular telephone. (Notably, the location information for 937-250-2475 placed it in the vicinity of **Target Residence 2**). A short time later, Cruz and Santiago-Agosto arrived at **Target Residence 2**. Tarabay once more approached their car, and an agent observed Tarabay appear to take something from his pocket and pass it to Santiago-Agosto. The Toyota then left **Target Residence 2** and proceeded to Wendy's. Based on my training and experience as well as the events described below, I believe that Portalatin contacted Tarabay and requested an additional quantity of drugs from him. Tarabay then provided these drugs to Portalatin's couriers – namely, Santiago-Agosto and Cruz.

        j.   Once at the Wendy's, Santiago-Agosto left the Toyota and entered CS-1's car. Inside, Santiago-Agosto delivered two additional ounces of suspected fentanyl to CS-1 in exchange for $4,000 in cash. Santiago-Agosto then exited

the CS's car, returned to the Toyota and drove away. Law enforcement followed the Toyota to **Target Residence 1**, where Cruz and Santiago-Agosto exited the car and entered the home at this location. Based on prior surveillance, I know that Portalatin resides at **Target Residence 1.** After a brief stay there, Cruz and Santiago-Agosto returned to the Toyota and then proceeded to **Target Residence 3**.

k. Shortly thereafter, law enforcement observed Portalatin leave **Target Residence 1**, enter a white truck and drive to **Target Residence 2**. Once there, Portalatin entered the building; Tarabay, who had been outside of the building, followed Portalatin into the apartment. After several minutes, Tarabay and Portalatin left the apartment together and entered into the white truck. The men then drove to a storage locker facility in Middletown, Ohio. Once there, they entered **Target Location 5** – Unit 46 at the storage facility. Notably, at the time, the location information for Tarabay's telephone coincided with the storage locker facility. Based on my training and experience, I know that drug traffickers frequently use storage lockers as locations at which they store long term firearms, illegal drug proceeds, and controlled substances themselves. Given that Portatlin and Tarabay proceeded to **Target Location 5** after a sale of a significant amount of controlled substances to CS-1 in exchange for cash, I

believe that there is a high probability that they placed

money, firearms, or items associated with drug trafficking

activity at **Target Location 5.** I also know that law

enforcement has contacted R&J Storage and that company

confirmed that Portalatin rents **Target Location 5** and has paid

for the unit through mid-November 2018.

E. **Law Enforcement Identifies Target Telephone 2 as Tarabay's New Telephone Number**

18. DEA obtained toll records for Tarabay's telephone

number – namely, 937-250-2475 – and noticed that calls to and

from that number began to dwindle as September 2018 progressed.

At the same time, agents noticed that Target Telephone 1 began

to contact more frequently a new telephone number around this

time – namely, Target Telephone 2. DEA obtained the subscriber

data for Target Telephone 2 and learned that the information

returned to "Tarabay Viera," *i.e.*, Gustavo Tarabay, who is also

the user of (937)250-2475. DEA reviewed toll records for

Target Telephone 2 between on or about September 18, 2018 and

on or about October 1, 2018, and analysis of those documents

confirmed that this number represented a second line that

Tarabay used to engage in drug trafficking. Most notably,

Target Telephone 2 had approximately 24 common contacted

numbers with Tarabay's other number (namely, (937)250-2475),

including contacts with Portalatin and Santiago-Agosto. It

should be noted that Target Telephone 2 had contact with approximately 37 total numbers during the above time frame. Approximately 24 of those numbers also appeared on tolls for Tarabay's (937)250-2475 number.

19. Upon identifying this number, during later September 2018, DEA obtained a federal search warrant authorizing the collection of certain location information from Target Telephone 2. Upon execution of this warrant, agents began to track Target Telephone 2. On or about October 2, 2018, location information from that warrant placed Target Telephone 2 in the vicinity of a casino in southern Ohio. Agents responded to the location of Target Telephone 2 and observed Gustavo Tarabay in that area.

**F.  The United States District Court for the Southern District of Ohio Authorizes the Interception of Wire Communications over Target Telephone 1**

20. On or about October 4, 2018, the Honorable Walter H. Rice, United States District Court Judge, signed an order authorizing the interception of wire communications over Target Telephone 1. As detailed more fully below, since the initiation of the court-authorized interception of those wire communications, Portalatin has used Target Telephone 1 to engage in discussions concerning drug trafficking activity with Tarabay at Target Telephone 2. Additionally, given the nature of many of these discussions, it appears that Tarabay likely

31

uses Target Telephone 2 to contact, among others, sources of drug supply.

### G. Portalatin Uses Target Telephone 1 to Arrange Drug Deliveries and Sales with Tarabay at Target Telephone 2.

21. On or about October 9, 2018, acting at the direction of DEA, CS-1 contacted Portalatin at Target Telephone 1 and ordered an ounce of fentanyl from him. Almost immediately after this contact ended, using Target Telephone 1, Portalatin called Tarabay at Target Telephone 2 and participated in a conversation. Toll records for Target Telephone 1 confirm that it contacted Target Telephone 2 at that time. Pursuant to the court authorized interception of Target Telephone 1, DEA monitored the conversation between Portalatin and Tarabay, which has been translated below from Spanish into the English by certified interpreters:

TARABAY:        What's up?

PORTALATIN:     Mmm… Not even a small call, huh? Not even a small call or nothing?

TARABAY:        Well, didn't you, didn't you tell me you were at the auction?

PORTALATIN:     That I was what?
TARABAY:        At the auction.
PORTALATIN:     No. I arrived early. I had a cough. I came back.

TARABAY:        All right. I just got back from the Wal-Mart and there I saw Ruti.

PORTALATIN:     Oh. She told me that. She called me and said "He is there." "Where? Put him on."

[VOICES OVERLAP]

TARABAY:        Yeah.

PORTALATIN:     "No. He's there making a deposit, I'll let you
                talk to him later." I said, "All right, [U/I]."

TARABAY:        Yes. I only went there to buy a thing of mash
                potatoes. Anthony is making something to eat.

PORTALATIN:     Okay.

TARABAY:        What are you doing?

PORTALATIN:     Here at home [U/I]. I'm coughing, and coughing,
                and coughing, and coughing, and coughing.

TARABAY:        Oh, drink your medicine. Drink your medicine,
                brother.

PORTALATIN:     Because I've only been drinking one time at
                night, I'm not getting better. I'm going to have
                to drink it [U/I]. Daily. Four (4) times, like
                it's supposed to be.

                [VOICES OVERLAP]

TARABAY:        Yes. [U/I]

PORTALATIN:     Yes, [U/I]. I got a call... I got a call from
                the black one, he is going to take one (1)
                tomorrow.

TARABAY:        Tomorrow?

PORTALATIN:     Yes, tomorrow he's taking one (1). Minimum.

TARABAY:        That's good.

TARABAY:        Listen, do you know what I was looking at,
brother?

PORTALATIN:     What?

TARABAY:        The haircut turned out nice, but at the top part
                towards the back there're some long hairs.

                                33

TARABAY:        [LAUGHS]

PORTALATIN:    No, because I couldn't see them. I [U/I], but I
               couldn't see them.

TARABAY:        Hey.

PORTALATIN:    I couldn't see.

           [VOICES OVERLAP]

TARABAY:        Tomorrow. Tomorrow I'll be over there with, God-
               willing.

PORTALATIN:    Yes. Do it.

TARABAY:        All right?

PORTALATIN:    It's fine then.

TARABAY:        Drink your medicine, brother. Drink your
               medicine please.

PORTALATIN:    Okay.

TARABAY:        I'll call you tomorrow.

PORTALATIN:    Okay. Sounds good.

TARABAY:        Okay. Bye.

PORTALATIN:    Bye.

Based on my training and experience, my familiarity with facts

of this case, as well as the events described below, I believe

that during this call Portalatin advised Tarabay that CS-1

(*i.e.*, the black one) had ordered a quantity of fentanyl for

delivery the following day. Tarabay indicates that he

understood, responding "that's good."

22. On or about October 10, 2018, during the late morning, CS-1 contacted Portalatin at Target Telephone 1 and confirmed the deal. Promptly after that call, at approximately 11:43 a.m., Portalatin used Target Telephone 1 to contact Tarabay at Target Telephone 2. I have reviewed toll records for Target Telephone 1 and confirmed that it contacted Target Telephone 2 at that time. Pursuant to the court authorized interception of Target Telephone 1, DEA monitored the conversation, which has been translated below from Spanish into the English by certified interpreters:

TARABAY:        Talk to me.

PORTALATIN:     What are you doing? I have been calling you.

TARABAY:        No, I was taking a shower, brother. And I was unclogging the toilet. Oh, man, it was a mess there!

PORTALATIN:     Didn't you tell me that you had already unclogged it?

TARABAY:        No, it got clogged again. This young guy puts so much things in there.

PORTALATIN:     Okay.

TARABAY:        Talk to me.

PORTALATIN:     Oh, well... the guy, the one I told you about...

TARABAY:        Yes.

PORTALATIN:     He is on his way to over here. He called.

TARABAY:        Oh really!

PORTALATIN:     [U/I]

TARABAY:        Uh, where are you sending him to or who is
                coming?  Should I take care of him?
PORTALATIN:     The fat lady, the fat lady will go for it.

TARABAY:        Okay. How much should I give her? [U/I]

                [VOICES OVERLAP]

PORTALATIN:     He is picking up one (1), he is picking up one
                (1) and he told me that his friend told him that
                if it's the same, he will take... he will take
                three (3) later. Something like that.
TARABAY:        All right. I'll give it to her.

PORTALATIN:     It should be more but since one got caught, the
                one that used to buy one (1) or two (2).
TARABAY:        Yes, you told me about that.

PORTALATIN:     Yes, well... it will be less. [U/I] like three
                (3) but he is taking one (1) for himself.
TARABAY:        Okay.

PORTALATIN:     Because [U/I] I told him that it was the same.
                But since the other guy wants to look at it...
TARABAY:        Mm-hmm.

PORTALATIN:     ...and if it's the same, he will buy. It's the
                same!
TARABAY:        Yes. All right, I'll give it to her. Right?

PORTALATIN:     They are at the dentist right now. I'll tell
                them to call you as soon as they get out of the
                dentist.
TARABAY:        All right.

PORTALATIN:     And you, are you okay?

TARABAY:        Yes, everything it's cool, everything it's cool,
                my brother. So, the fat lady is at the dentist?
PORTALATIN:     Yes, she has a dentist appointment.

TARABAY:        Oh, okay. When she calls me...in case that they
                take too long, if you want, you can send him
                to... so she would not pressure herself, send
                him to the stores for me.
PORTALATIN:     Oh...

36

TARABAY:        I'll take care of him.

PORTALATIN:     The thing is that he doesn't like to come
                inside.

TARABAY:        He doesn't.... He likes to be outside?

PORTALATIN:     Yes, he likes to be close to the highway because
                he can get on it right away and leave. Since he
                knows that this is hot.

TARABAY:        Well, I don't know how long they will have the
                fat lady there. You know what sometimes they
                take too long.

PORTALATIN:     Either way, I'll keep him over here.

TARABAY:        Oh, okay, that's fine.

PORTALATIN:     Okay, thanks [U/I] If he [U/I] I'll ask him,
[U/I]

TARABAY:        No, if not... I could walk... you know, I could
                walk two (2) blocks or something. I could walk
                up there.

PORTALATIN:     Okay.

TARABAY:        I could walk. Okay?

PORTALATIN:     Okay.

TARABAY:        All right then.

Based on my training and experience, my familiarity with facts

of this case, as well as the events described below, I believe

that during this call Portalatin advised Tarabay that CS-1 had

confirmed his planned purchase of drugs and was on his way to

acquire these controlled substances.  Tarabay then asked who

Portalatin intended to send to his (Tarabay's) home to acquire

the drugs – a courier or CS-1.  Portalatin indicated that he

planned to send Santiago-Agosto (i.e., the "fat lady") to

retrieve the drugs from Tarabay and then deliver them to CS-1. After Tarabay confirmed that he would supply the drugs to Santiago-Agosto, he then suggested that he could deliver the drugs to CS-1 himself. Portalatin declined the offer, indicating that CS-1 did not like to enter to homes to complete drug deals and that the area had a heavy police presence (i.e., was "hot").

    23. Almost immediately after the preceding call, on or about October 10, 2018, Portalatin used Target Telephone 1 to contact Tarabay at Target Telephone 2. I have reviewed toll records for Target Telephone 1 and confirmed that it contacted Target Telephone 2 at that time. Pursuant to the court authorized interception of Target Telephone 1, DEA monitored the conversation, which has been translated below from Spanish into the English by certified interpreters:

TARABAY:    Talk to me.

PORTALATIN:    I was trying to call the fat lady.

TARABAY:    Oh, and you messed up?

PORTALATIN:    Yes.

TARABAY:    All right.

PORTALATIN:    She is on her way right now. Okay.

TARABAY:    Deal

Based on my training and experience, my familiarity with facts
of this case, as well as the events described below, I believe
that during this call Portalatin intended to call Santiago-
Agosto, but accidently re-dialed Tarabay at Target Telephone 2.
Despite the misdial, Portalatin nevertheless confirmed with
Tarabay that Santiago-Agosto (*i.e.*, the "the fat lady") would be
arriving shortly to acquire the drugs.

24.  Around the time of these calls, law enforcement
established surveillance at multiple locations in and around
Middletown, Ohio: including: **Target Residence 1** (the home of
Portalatin); **Target Residence 2** (the home of Tarabay); and
**Target Residence 3** (the home of Santiago-Agosto and Cruz).  In
particular:

a.  Sometime thereafter, DEA observed who was later
confirmed to be Santiago-Agosto and Cruz depart **Target Residence
3** in a silver Toyota.  The duo ultimately travelled to **Target
Residence 2**, which Taraby exited.  Tarabay, who appeared to be
talking on his cellular telephone, approached the Toyota,
removed an item from his pant's pocket, and passed the object
through the car's window.  Based on my training and experience,
as well as the events described elsewhere in this affidavit, I
believe that Tarabay passed a quantity of fentanyl to Santiago-

Agosto.

b.     After this exchange, the Toyota departed **Target Residence 2** and proceeded to a prearranged meet location – namely, a Wendy's – in Middletown, Ohio.  Once there, Santiago-Agosto met with CS-1 and delivered to CS-1 multiple grams of fentanyl in exchange for cash.  (It should be noted that investigators met with CS-1 after the deal and secured the suspected fentanyl from CS-1).

c.     Upon completion of this deal, law enforcement followed the Toyota to the parking lot of a Dollar Tree store, where Portalatin arrived in a silver Kia.  The Toyota and Kia parked close to each other with the windows rolled down; given the proximity of the vehicles to one another, investigators could not determine whether Santiago-Agosto gave to Portalatin the money from the deal with CS-1.  Portalatin eventually left the parking lot, and investigators ultimately followed him to **Target Residence 2**.  Around the time of his arrival, Portalatin used Target Telephone 1 to contact Tarabay at Target Telephone 2.  I have reviewed toll records for Target Telephone 1 and confirmed that it contacted Target Telephone 2 at that time. Pursuant to the court authorized interception Target Telephone 1, DEA monitored the conversation, which has been translated

below from Spanish into the English by certified interpreters:

TARABAY:       Hello.

PORTALATIN:    I'm down here.

TARABAY:       I'll be there. I'm talking to the cousin, I'll be
               there.

Shortly after this exchange, Tarabay exited **Target Residence 2**
and entered the Kia with Portalatin. The pair drove away and
proceeded to **Target Residence 1,** which they entered. Notably,
before Portalatin arrived at **Target Residence 2**, location
information for Target Telephone 2 (which was collected pursuant
to a federal warrant) placed that device in the general vicinity
of that address.

## H.    Tarabay Uses Target Telephone 2 to Discuss Other, Unknown Drug Transactions with Portalatin at Target Telephone 1.

25.    On or about October 13, 2018, around 1:00 p.m.,
Portalatin used Target Telephone 1 to contact Tarabay at Target
Telephone 2. I have reviewed toll records for Target Telephone
1 and confirmed that it contacted Target Telephone 2 at that
time. Pursuant to the court authorized interception of Target
Telephone 1, DEA monitored the conversation, which has been
translated below from Spanish into the English by certified
interpreters:

TARABAY:       [U/I]

41

PORTALATIN:    Hello.

TARABAY:       Where are you at?

PORTALATIN:    Here, at home, and you?

TARABAY:       I came, came over here to Dayton. This dude sent
               me to, to look at some things. My cousin.
PORTALATIN:    Oh.

TARABAY:       Yeah. Something "the Camaron" [the shrimp] had
               received. To see if, I come to see if it is very,
               very good. Alright.
PORTALATIN:    Call me. [U/I].

               [VOICES OVERLAP]

TARABAY:       [U/I]. I'm going to take pictures of it. I'm
               going to take pictures and everything and I will,
               once I'm there I, I, I will let you know so you
               can see it.
PORTALATIN:    Okay [In English]. Do it.

TARABAY:       Okay. [U/I]

PORTALATIN:    Okay. [In English]

Based on my training and experience as well as my familiarity
with the facts of this case, I believe that, in the above
conversation, Tarabay advised that he had travelled to Dayton,
Ohio at the direction of unidentified person (i.e., "this dude
sent me") to look at a possible shipment of controlled
substances that had arrived in this area. Tarabay indicated
that a person whom he only identified as "Camaron", the Spanish
word for shrimp, had received this shipment. Tarabay advised
that he checked "it" (i.e., the drugs) for quality (i.e., "to

42

see if it is very good"). Tarabay explained that he would send a picture of the product to Portalatin. It should be noted that toll records do not reflect any subsequent type of text message between Portalatin and Tarabay. Based on the foregoing, I believe that Tarabay has an as-yet-unidentified source of drug supply in the Dayton area; based on this statements, he also appears to have an unknown individual who directed him to this source.

26. On or about October 14, 2018, around 4:27 p.m., Tarabay used Target Telephone 2 to contact Portalatin at Target Telephone 1. I have reviewed toll records for Target Telephone 1 and confirmed that it received a contact from Target Telephone 2 at that time. Pursuant to the court authorized interception of Target Telephone 1, DEA monitored the conversation, which has been translated below from Spanish into the English by certified interpreters:

PORTALATIN:     Hello.

TARABAY:        How's the man doing?

PORTALATIN:     Here at home, and you?

                [VOICES OVERLAP]

TARABAY:        It's cold, don't go out. It's so cold and rainy.
                [CHUCKLES]. Damn it!
PORTALATIN:     And you, where are you?

43

TARABAY:        I'm right outside.

PORTALATIN:     Hmm.

TARABAY:        What are you doing? Everything cool?

PORTALATIN:     Yes.

TARABAY:        I went to, to send some money just now. I sent
                three (3) pesos to the cousin.
PORTALATIN:     Oh, okay.

TARABAY:        Yes. I sent it right the way, because why--
                They're not mine, they're his.
                [VOICES OVERLAP]

PORTALATIN:     Oh. You sold something?

TARABAY:        What?

PORTALATIN:     Did you sell more?

TARABAY:        Well, there with the people from Dayton.

PORTALATIN:     Oh.

                [VOICES OVERLAP]

TARABAY:        With his people.

PORTALATIN:     Okay.

TARABAY:        Anyway, I don't make anything because they're
                his. They're not his, they're his friend's.
                They're giving me a hard time.
                [VOICES OVERLAP]

PORTALATIN:     Oh.

TARABAY:        "Well, there's your money."

                [VOICES OVERLAP]

PORTALATIN:     [U/I]

                                44

TARABAY:        No, the same at one thousand-four (1,000-4), one
                thousand- four (1,000-4).

PORTALATIN:     No. I meant, how many do you have left?

                [VOICES OVERLAP]

TARABAY:        Oh. I have... four (4) but he told me that, if I
                need during the week, I could get more...they
                could bring me half. (1/2). He said, "that way
                you don't get tangled up with a lot."
PORTALATIN:     Okay.

TARABAY:        Half a shrimp-- half a kilo of shrimp. Fresh and
                nice!

PORTALATIN:     Uh-huh, that's great.

TARABAY:        It's beautiful, a fresh catch from the beach.

PORTALATIN:     Hmm.

TARABAY:        [U/I] to the casino or what?

PORTALATIN:     I don't have money.

TARABAY:        How is that possible, that you don't have?

PORTALATIN:     Nothing, nothing, nothing.

TARABAY:        Not even a hundred dollars ($100)? Nothing?

PORTALATIN:     Nothing!

TARABAY:        Well, that means that we are not going until,
                until-- Hey, how are we going to do it with
                [U/I]? He will asks for some on Tuesday.
PORTALATIN:     Oh, really?

TARABAY:        Yes, but he will want that from... that shrimp
                that Mario has up there.  But he doesn't want to
                go there.
PORTALATIN:     Send the girls, I can tell them.

45

TARABAY:        No, no, he doesn't want-- Let me asks him if he
                could bring it down tomorrow.
PORTALATIN:     Hmm.

TARABAY:        We will make, we will make a... some bucks, one
                thousand dollars ($1,000).
PORTALATIN:     Mm-hmm.

TARABAY:        Sounds good! Five hundred (500) each.

PORTALATIN:     Yeah.

TARABAY:        Right? Well, we are staying home today, brother.
                What else we could do?
PORTALATIN:     I'll go over there in a while. I'll eat something
                right now and I'll be there shortly. [U/I]
TARABAY:        In a while because it's too cold. It's raining,
                I'm telling you.
PORTALATIN:     Yeah.

TARABAY:        I don't what you to get sick.

PORTALATIN:     Uh-huh.

TARABAY:        Right?

PORTALATIN:     All right, I'll call you later.

TARABAY:        Okay, take care.

PORTALATIN:     Okay.

Based on my training and experience, as well as my familiarity
with the facts of this case, I believe that, in the above-
described call, Tarabay revealed that he had served as the
middleman in a drug deal for someone that he identified as "the
cousin." Tarabay indicated that he sold the drugs in Dayton,
but that he did not make any money on the deal. Tarabay later

explained that an unknown person only identified as "Mario" had a half kilo of fresh shrimp from the beach, likely coded language for some type of illegal controlled substance recently shipped into the area. When Portalatin suggests that they send the girls (i.e., Santiago-Agosto or Cruz) to acquire the drugs, Tarabay declines and indicates that he will ask the source to bring the drugs down to him. Tarabay explains that he and Portalatin can make $500 each from the sale. Based on this exchange, I believe that Tarabay and Portalatin are engaged in ongoing drug trafficking activity.

**I.    The United States District Court for the Southern District of Ohio Authorizes the Interception of Wire Communications over Target Telephone 2**

27. On or about October 22, 2018, the Honorable Walter H. Rice, United States District Court Judge, signed an order authorizing the interception of wire communications over Target Telephone 2. As detailed more fully below, since the initiation of the court-authorized interception of those wire communications, Tarabay has used Target Telephone 2 to engage in discussions concerning drug trafficking activity.

**J.  During Court-Authorized Interceptions, Tarabay Indicates that He Engages in Ongoing Drug Trafficking Activity with Individuals Throughout Southern Ohio.**

28.     On or about October 23, 2018, around 10:09 p.m., Tarabay used Target Telephone 2 to speak with an individual at 314-489-3718 – a cellular telephone number subscribed to in the name of "Celines Rivera." I have reviewed toll records for Target Telephone 2 and confirmed that it had contact with 314-489-3718 at that time. Pursuant to the court authorized interception of Target Telephone 2, DEA monitored the conversation, which has been translated below from Spanish into the English by certified interpreters:

"RIVERA":     Hey, send me the prices of all those things again. I have someone asking me. Send me the prices.

TARABAY:     I'll send them to you right now.

"RIVERA":     Deal. They're calling me.

TARABAY:     [U/I]

"RIVERA":     Bye.

Based on my training and experience, my familiarity with the facts of this investigation, and review of toll records, I know that, through above-referenced conversation, the user of 314-489-3718, i.e., "Rivera", solicited from Tarabay a price quote for an unidentified quantity of illegal drugs, i.e., "prices of

48

all those things." In response, Tarabay indicated that he would "send them", i.e., the price for the drugs, to "Rivera" presumably by sometime of electronic communication, such as a text message. This recent exchange indicates that Tarabay is participating in an ongoing criminal activity and suggests that he had drugs currently available for sale at that time.

    29. During the interception of Target Telephone 2, law enforcement monitored several calls between Tarabay and an individual identified at this time only as "Mario." During the week of October 29, 2018, these calls centered on a potential drug transaction involving multiple ounces of heroin in which Tarabay ultimately traveled to Columbus, Ohio to retrieve these controlled substances. In particular:

        a. During the evening of October 29, 2018, law enforcement intercepted[3] a call between Tarabay and Celines Rivera. During this conversation, Rivera agreed to give Tarabay a ride to Columbus the next day. Based on earlier separate interceptions between Tarabay and "Mario", it appeared that Tarabay intended to travel to Columbus to collect drugs from "Mario."

---

[3] The term intercepted call refers to wire communications intercepted and monitored pursuant to the order of the Honorable Walter H. Rice referenced above.

49

b. During the early morning of on or about October 30, 2018, law enforcement observed Tarabay leave **Target Residence 2** and enter a silver Mazda driven by Paris Frazier and also occupied by Rivera. Notably, the registration to the silver Mazda returned to 4629 Freedom Court – a home a few doors away from **Target Residence 4**.

c. Law enforcement followed Tarabay and his companions to a Mexican restaurant in Columbus, Ohio. Upon arriving at this location, law enforcement intercepted a call between Tarabay and "Mario"; "Mario" indicated that a relative planned to bring the item to Tarabay and that Tarabay should eat at the restaurant while waiting. Consistent with this discussion, Tarabay and his companions exited the car and entered the restaurant. A short time later, Tarabay received another call from "Mario" which law enforcement intercepted and monitored pursuant to the court's order. During this conversation, "Mario" instructed Tarabay to go outside and meet his uncle; "Mario" also questioned Tarabay concerning when the money would be ready to which Tarabay indicated that evening.

d. Tarabay exited the restaurant, briefly entered a gold Nissan that had arrived in the area, and then left that vehicle. A short time later, Tarabay and his companions entered

50

their own car and drove to **Target Residence 4** in Middletown,
Ohio. (Law enforcement has contacted government officials
responsible for this HUD housing project and learned that **Target
Residence 4** is leased in the name of Celines Gomez Rivera; as
noted above, Celines Rivera participated in a call with Tarabay
on or about October 23, 2018 in which she appeared to ask for
drug prices). The group including Tarabay entered **Target
Residence 4**. Over the next hour, law enforcement observed
Tarabay and Frazier exit and re-enter **Target Residence 4** on two
occasions. Finally, the pair left with Frazier driving Tarabay
to **Target Residence 2**.

e. After Tarabay arrived at **Target Residence 2**, he
engaged in an intercepted telephone conversation with an unknown
woman using a Mexican telephone number. During their exchange,
Tarabay indicated that he had a customer named "Boogie" coming
in a couple of hours. He further explained that he did not
intend to take any money to "Mario" tonight because "Mario"
believed that his courier may have been followed by police.

f. During the early evening of on or about October
30, 2018, law enforcement saw a Mercedes arrive at **Target
Residence 2**. Tarabay exited **Target Residence 2** and briefly
entered the Mercedes before returning to **Target Residence 2**.

51

Sometime after this incident, Tarabay engaged in an intercepted telephone conversation with Rivera; he asked her to send the white guy (i.e., Frazier) over to **Target Residence 2** to drive him (Tarabay) to the casino.

g.    Law enforcement followed the Mercedes after it departed **Target Residence 2.** A short time later, Ohio State Police stopped the Mercedes and identified its driver as Jaberri J. Bratton. During an ensuing probable cause search of the vehicle, officers discovered multiple ounces of suspected heroin. Bratton advised officers that he had just purchased the heroin from a drug dealer at the outlet mall.

h.    Based on my training and experience, I believe that Tarabay obtained multiple ounces of heroin from "Mario" in Columbus and then returned to **Target Residence 4** to potentially process and/or repackage these drugs before delivering them to Bratton outside of **Target Residence 2**.

30.  On or about November 1, 2018, Tarabay engaged in intercepted telephone conversations over Target Telephone 2 with "Mario". During these discussions, "Mario" not only directed Tarabay to bring "newspaper" (i.e., code for money) to Columbus but also requested "one" (i.e., possibly some type of controlled substance) to check it out for now. Tarabay ultimately agreed

52

to do so.  In particular:

      a.  During early afternoon, agents saw Tarabay leave **Target Residence 2** and enter a green Honda driven by a person identified as Antonio Rosario.  (Through intercepted calls, Tarabay had agreed to pay Rosario roughly a hundred dollars to drive him (Tarabay) to Columbus).  Over the next approximately 60 to 90 minutes, Tarabay participated in a series of intercepted calls over Target Telephone 2 with "Mario".  During these calls, Tarabay apprised "Mario" of his location, and the pair ultimately arranged a location to meet.  "Mario" instructed Tarabay to arrive alone.

      b.  Around 4:32 p.m., law enforcement saw Tarabay meet two Hispanic men in a neighborhood in the Columbus metro area.  After this short encounter, the two Hispanic men then entered a blue Chevy Traverse with license plates registered to **Target Residence 7**.  Agents proceeded to follow the Traverse. While doing so, law enforcement monitored an intercepted call over Target Telephone 2 between Tarabay and "Mario".  During this exchange, Tarabay indicated that he was "counting it", suggesting that he had delivered some type of controlled substance to "Mario" in exchange for cash which he (Tarabay) was now counting.  (It should be noted that, based on the earlier

call, Tarabay also likely delivered drug money to "Mario" in addition to the drugs). "Mario" explained that an unknown individual planned to get 15 in the next week – likely, some quantity of narcotics. Tarabay expressed interest in acquiring a portion of the 15 and indicated that he planned to cut it, i.e., add some type of non-controlled substance to it to increase its quantity.

      c.   Over the remainder of the afternoon into early evening, agents followed the Traverse until it arrived at the Bridgestone Apartment Complex where **Target Residence 6** is located. Law enforcement saw the two men exit the Traverse carrying grocery bags and approach **Target Residence 6**; however, given their vantage point, law enforcement could not confirm whether the men entered **Target Residence 6** or a neighboring unit.

    31.   Following the events described above, law enforcement reviewed GPS data previously collected for another cellphone that Tarabay used during fall 2018. (The data had been collected pursuant to a federal search warrant). On at least two occasions during fall 2018, the GPS information placed Tarabay's telephone at or near **Target Residence 7**.

    32.   On or about November 5, 2018, law enforcement

conducted surveillance at both **Target Residence 6 and 7**. While at the Stonebridge Apartments on that day, law enforcement saw one of the two men who had met with Tarabay on November 1, 2018 enter/exit **Target Residence 6.** (Law enforcement also obtained lease information for **Target Residence 6,** and the renter provided a cellular telephone number that, according to toll records, has had contact with a cellular telephone belonging to "Mario." That Mario phone also had contact with Tarabay). Additionally, DEA observed parked at **Target Residence 7** the Traverse that the two men drove on November 1, 2018. Finally, during in or around late October 2018, agents obtained a federal search warrant authorizing the collection of location information for "Mario"'s cellular telephone. Data from that warrant repeatedly has placed "Mario"'s cellular telephone at both **Target Residence 6** and **Target Residence 7** since that time.

33. Throughout late October into November 2018, law enforcement monitored several calls in which Tarabay either directly or indirectly threatened to harm Portalatin over a drug debt. In particular, based on these intercepted communications, Tarabay indicated that he planned to invite Portalatin to join him in Pennsylvania sometime after November 6, 2018. In doing so, he suggested that Portalatin would not make the return trip.

Tarabay also arranged to procure a firearm and repeatedly suggested that Portalatin owed money.

34. Based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities:

a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

56

e.   It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f.   It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs.  Drug traffickers commonly front (provide drugs on consignment) to their clients.  The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

g.   It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.   That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition

57

and concealment of large sums of money resulting from drug trafficking activities.

       i.   When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts. Drug traffickers frequently keep such records at their residences or at stash houses.

       j.   Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles. Drug traffickers frequently keep records relating to such travel at their residences or at stash houses.

       k.   It is common practice that drug traffickers commonly maintain books and similar documents which reflect

58

names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list. Drug traffickers frequently keep such materials at their residences or at stash houses.

l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n. Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.),

59

bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.    The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations.  Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another.  When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers.  The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors.  The location of the source

60

of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

q. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and

then drive away. Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

35. In summary, given the duration of this conspiracy, the amounts of money exchanged during its existence, and these individuals respective involvement in this scheme, I believe that the homes of Portalatin (**Target Residence 1**), Tarabay (**Target Residence 2**), Santiago-Agosto/Cruz (**Target Residence 3**), Rivera (**Target Residence 4**) will contain the indicia of drug trafficking described above, including, but not limited to: the supplies used to process, cut, and package drugs; bulk amounts of cash; digital scales; controlled substances; and the cellular telephones that these individuals have used to engage in their illegal business. I also know that drug traffickers often maintain away from their home – such as at storage lockers – additional quantities of drugs, bulk cash and firearms; they do so to avoid storing at a single place all of their product and proceed thereof. The storage locker located at **Target Location 5**, which Portalatin has rented until at least mid-November 2018, bears the hallmarks of such a location. Finally, **Target Residences 6** and **7** appear to be locations where "Mario", an apparent drug supplier for Tarabay, likely lives and/or stores drugs, proceeds, and other indicia of the drug trade. Most

importantly, the greatest chance law enforcement has to identify "Mario" is to actually locate the telephone that he uses to communicate with Tarabay. Court-authorized GPS pings frequently place that cellular telephone at **Target Residences 6** and **7.**

### XII.

### CONCLUSION

Based on the foregoing, I respectfully request that the Court authorize the above-described search warrants and criminal complaints.

Lauren Wagner
Special Agent
Drug Enforcement Administration

Sworn and subscribed before me on the _6th_ day of November 2018.

HONORABLE SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

ATTACHMENT A

**412 Weaver Street, Middletown, Ohio, including any outbuildings, storage units, garages or curtilage associated with this property.** The residence is further described as an unit within a multi-unit building. The residence has a white door and the numbers "412" appear above its entrance. The residence is pictured below:



64

ATTACHMENT B

2347 Sutphin Street, Middletown, Ohio, including any
outbuildings, storage units, garages or curtilage associated
with this property. The residence is more fully described as a
two story townhouse located within a multi-unit structure. The
residence has brown brick on the lower half, black shingled roof
and white trim. The numbers "2347" appear above its entrance.

ATTACHMENT C

1203 Baltimore Street, Middletown, Ohio, including any outbuildings, storage units, garages or curtilage associated with this property.  The residence is further described as a single story, single family residence with brown brick, white trim, white screen door and tan siding near the roof.  The numbers "1203" are displayed to the left of the front door.  The residence is pictured below.



ATTACHMENT D

**4623 Freedom Ct, Middletown, Ohio, including any outbuildings, storage units, garages or curtilage associated with this property.** The residence is further described as a two story multi-family townhouse with brown brick on lower level, white trim, tan siding, white trim on the upper level, brown shingled roof, and covered porch with brown screen door. The numbers "4623" are displayed above the front door. The residence is pictured below.



ATTACHMENT E

R & J Storage, Unit #46, 3124 Verity Parkway, Middletown, Ohio.
The location is further described as a storage unit with a
brown/tan door.  The numbers "46" are fixed in black on the
frame of the unit.  The unit is pictured below:



ATTACHMENT F

**5821 Stonebridge, Columbus, Ohio, including any outbuildings, storage units, garages or curtilage associated with this property.** This residence is more fully described as an apartment within a multi-unit complex. The residence has tannish/off-white siding and a black door. The numbers "5821" appear on the door. The residence is depicted on the right portion of the picture below.



ATTACHMENT G

**7791 Heathermoor, Columbus, Ohio, including any outbuildings, storage units, garages or curtilage associated with this property.** The residence is further described as an apartment within a multi-unit complex. The residence has yellow siding and a black/dark front door. The numbers "7791" appear in white next to the front door. The residence is pictured below.



70

ATTACHMENT H

I submit that there is probable cause to search for the
following items:

A.  Log books, records, payment receipts, notes, and/or
    customer lists, ledgers, and other papers or electronic
    records relating to the transportation, ordering,
    purchasing, processing, and distribution of controlled
    substances.

B.  Papers, tickets, notices, credit card receipts, travel
    schedules, travel receipts, passports, and/or records,
    and other items relating to domestic and foreign travel
    to obtain and distribute narcotics and narcotics
    proceeds, including, but not limited to airline
    receipts, vehicle rental receipts, credit card receipts,
    travel schedules, diaries, hotel receipts, truck logs,
    travel agency vouchers, notes, records of long distance
    telephone calls, e-mail and other correspondence.

C.  Address and/or telephone books and papers reflecting
    names, e-mail and physical addresses and/or telephone
    numbers of individuals, partnerships, or corporations
    involved in drug trafficking and money laundering.

71

D.    Financial records, financial statements, receipts,
      statements of accounts and related bank records, money,
      drafts, letters of credit, money orders and cashier's
      checks receipts, passbooks, bank checks, escrow
      documents, and other items evidencing the obtaining,
      secreting, transfer, and/or concealment of assets and
      the obtaining, secreting, transferring, concealment,
      and/or expenditure of money.

E.    Electronic equipment such as pagers, computers,
      electronic organizers, facsimile machines, cellular
      telephones, caller ID, telephone answering machines,
      police scanners and two-way radios.

F.    United States currency, precious metals, coins bullion,
      jewelry, and financial instruments, including, but not
      limited to stocks and bonds.

G.    Photographs and/or photographic albums or video tapes
      and recordings of houses and other real estate,
      automobiles, and of other assets, persons, and/or
      controlled substances.

H.    Indicia of occupancy, residency, and/or ownership of the
      premises, and vehicles including, but not limited to

72

utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

I. Illegal drugs, including, but not limited to cocaine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

J. Firearms and ammunition.

K. Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

L. Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations,